## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KYU HO HAN, derivatively on behalf of ARRAY TECHNOLOGIES, INC. f/k/a ATI INTERMEDIATE HOLDINGS, LLC,<br><br>　　　Plaintiff,<br><br>　　　v.<br><br>JIM FUSARO, NIPUL PATEL, TROY ALSTEAD, ORLANDO D. ASHFORD, FRANK CANNOVA, RON P. CORIO, BRAD FORTH, PETER JONNA, JASON LEE, ATI INVESTMENT PARENT, LLC, OAKTREE ATI INVESTORS, L.P., OAKTREE POWER OPPORTUNITIES FUND IV, L.P., OAKTREE POWER OPPORTUNITIES FUND IV (PARALLEL), L.P., OAKTREE CAPITAL GROUP HOLDINGS, L.P., OAKTREE CAPITAL MANAGEMENT, L.P.,<br><br>　　　Defendants,<br><br>　　　and<br><br>ARRAY TECHNOLOGIES, INC.,<br><br>　　　Nominal Defendant. | Case No.:　1:21-cv-06509<br><br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Kyu Ho Han ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Array Technologies, Inc. ("Array" or the "Company"), formerly known as ATI Intermediate Holdings, LLC, files this Verified Shareholder Derivative Complaint against Defendants Jim Fusaro, Nipul Patel, Troy Alstead, Orlando D. Ashford, Frank Cannova, Ron P. Corio, Brad Forth, Peter Jonna, Jason Lee, (collectively, the "Individual Defendants"), ATI Investment Parent, LLC, Oaktree ATI Investors, L.P., Oaktree Power Opportunities Fund IV, L.P.,

Oaktree Power Opportunities Fund IV (Parallel), L.P., Oaktree Capital Group Holdings, L.P., and Oaktree Capital Management, L.P. (collectively, the "Oaktree Defendants," and together with the Individual Defendants, the "Defendants") for breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of the Company and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Array, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Array's directors, officers, and controlling shareholders between October 14, 2020, and May 11, 2021, both dates inclusive (the "Relevant Period").

2. Based in Albuquerque, New Mexico, Array is a Delaware corporation that focuses on manufacturing ground-mounting systems used in solar energy projects. The Company's principal product is an integrated system of steel supports, electric motors, gearboxes, and electronic controllers, commonly referred to as a single-axis "tracker," that moves solar panels throughout the day to maintain an optimal orientation to the sun.

3. The Company made an initial public offering in October 2020 ("IPO") and made secondary public offerings in December 2020 ("December 2020 SPO") and March 2021 ("March

2021 SPO") (collectively, the "Offerings"). According to SEC filings, 47.5 million shares were offered in the IPO at $22.00 per share, 31.88 million shares were offered in the December 2020 SPO at $35.00 per share, and 31.05 million shares were offered in the March 2021 SPO at $28.00 per share.

4.      During the Relevant Period, the Individual Defendants and the controlling members (collectively, the "Defendants") made, or caused the Company to make, materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Defendants failed to disclose issues involving rising steel and freight costs that were having a material negative impact on the Company's operations and also consistently made materially misleading statements regarding the Company's business and prospects that failed to account for these rising costs.

5.      As a matter of fact, even before the Relevant Period, increases in ocean freight, truck freight, and steel prices were starting to have a material negative impact on the Company's margins and prospects, ultimately causing the Company's profit to fall short of expectations.

6.      On May 11, 2021, the Company announced its financial results for the first fiscal quarter of 2021 ("Q1" or "Q1 2021"). The results indicated that the Company's revenues and gross profit for Q1 2021 had drastically declined compared to the Company's revenues and gross profit for the first fiscal quarter of 2020 ("Q1 2020"). Specifically, the report indicated that revenues had fallen 44% compared to the prior-year period and gross profit had decreased 63% compared to the prior-year period, largely due to increased steel and freight costs. The report further indicated that spot prices of hot rolled coil steel, the primary raw material used in the Company's products, more than doubled from Q1 2020 to Q1 2021, and continued to rise in the second fiscal quarter of 2021 ("Q2" or "Q2 2021"). That same day, May 11, 2021, the Company held an investor call on which

Defendant Fusaro disclosed that "[t]he average cost to ship a container from Asia to the West Coast has increased by more than 145% from April 2020 to April 2021."

7.    On this news, which was released after markets closed and which contradicted the Company's previous statements about cost management in its supply chain, the Company's share price dropped $11.49 (or approximately 46%) from $24.95 at close on May 11, 2021 to $13.46 at close on May 12, 2021. Accordingly, Plaintiff has suffered significant losses and damages.

8.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that touted the Company's ability to keep costs low and that failed to disclose, *inter alia*, that: (1) steel prices had been increasing drastically since Q1 2020; (2) both ocean and truck freight costs had been increasing significantly since April 2020; (3) as a result, the Company's margins and prospects were rapidly declining; and (4) the Company failed to maintain adequate internal controls related to disclosures. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

9.    Also in breach of their fiduciary duties, the Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

10.    In yet further breach of their fiduciary duties, and in violation of SEC regulations and the Company's own Audit Committee Charter, Business Code of Conduct, and Corporate Governance Guidelines, the Defendants caused the Company to fail to maintain adequate disclosure controls.

11.     Moreover, the Oaktree Defendants and at least four of the Individual Defendants—Corio, Forth, Fusaro, and Patel—breached their fiduciary duties by selling shares at prices that were artificially inflated due to Defendants' conduct in making and/or causing the Company to make materially false and misleading statements regarding the Company's costs, margins, and prospects.

12.     The Individual Defendants also violated 14(a) of the Exchange Act by causing the Company to issue a proxy statement, filed with the SEC on Schedule 14A on April 26, 2021 (the "2021 Proxy Statement"), which contained false and misleading statements and omissions of material fact.

13.     The Defendants' breaches of fiduciary duty and other misconduct have subjected certain of the Defendants to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake intake internal investigations, the need to implement adequate controls, and will likely cost the Company millions of dollars going forward.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the Defendants' breaches of fiduciary duty, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Action; and of their not being disinterested and/or independent directors, a majority of Array's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, and 17 C.F.R. § 240.14a-9.

17.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of Array. Plaintiff has continuously held Array common stock at all relevant times.

### Nominal Defendant Array

22.     Array is a Delaware corporation with its principal executive offices at 3901 Midway Place NE, Albuquerque, New Mexico, 87109. Array's shares trade on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "ARRY."

### Defendant Fusaro

23.     Defendant Jim Fusaro ("Fusaro") has served as the Company's Chief Executive Officer ('CEO") since June 2018 and is also a member of the Board.

24.    For the fiscal year ended December 31, 2020, Defendant Fusaro received $3,107,811 from the Company. This included $519,583 in salary, $424,000 in option awards, $1,340,328 in stock awards, $812,500 in non-equity incentive plan compensation, and $11,400 in all other compensation.

25.    Defendant Fusaro individually sold millions of the Company's shares at inflated prices in the IPO, the December 2020 SPO, and the March 2021 SPO. The table below shows the proceeds Fusaro gained from the three Offerings:

| Offer | Offer Price | Shares Beneficially Owned Before Offering | Shares Beneficially Owned After Offering Assuming No Exercise of Underwriters' Option | Shares Sold Assuming No Exercise of Underwriters' Option | Proceeds Assuming No Exercise of Underwriters' Option | Shares Beneficially Owned After Offering Assuming Full Exercise of the Underwriters' Option | Shares Sold Assuming Full Exercise of the Underwriters' Option | Proceeds Assuming Full Exercise of the Underwriters' Option |
|---|---|---|---|---|---|---|---|---|
| IPO | $22[1] | 1,963,344 | 1,700,480 | 262,864 | $5,783,008 | 1,644,514 | 318,830 | $7,014,260 |
| Dec. 2020 SPO | $35[2] | 1,644,514 | 1,234,397 | 410,117 | $14,354,095 | 1,198,328 | 446,186 | $15,616,510 |
| Mar. 2021 SPO | $28[3] | 1,151,040 | 978,703 | 172,337 | $4,825,436 | 937,258 | 213,782 | $5,985,896 |

26.    Thus, assuming full exercise of the underwriters' option to purchase additional shares, Defendant Fusaro received $28,616,666 for selling his shares at the Offerings.

---

[1] An underwriting discount of $1.21 per share applied at the IPO and is not reflected in the illustrative calculations presented in this complaint.

[2] An underwriting discount of $1.05 per share applied at the December 2020 SPO and is not reflected in the illustrative calculations presented in this complaint.

[3] An underwriting discount of $0.77 per share applied at the March 2021 SPO and is not reflected in the illustrative calculations presented in this complaint.

**Defendant Patel**

27.     Defendant Nipul Patel ("Patel") has served as the Company's Chief Financial Officer ("CFO") since April 2019.

28.     Defendant Patel individually sold nearly 300,000 of the Company's shares at inflated prices in the IPO, the December 2020 SPO, and the March 2021 SPO. The table below shows the proceeds Defendant Patel gained from the three Offerings:

| Offer | Offer Price | Shares Beneficially Owned Before Offering | Shares Beneficially Owned After Offering Assuming No Exercise of Underwriters' Option | Shares Sold Assuming No Exercise of Underwriters' Option | Proceeds Assuming No Exercise of Underwriters' Option | Shares Beneficially Owned After Offering Assuming Full Exercise of the Underwriters' Option | Shares Sold Assuming Full Exercise of the Underwriters' Option | Proceeds Assuming Full Exercise of the Underwriters' Option |
|---|---|---|---|---|---|---|---|---|
| IPO | $22 | 608,342 | 551,239 | 57,103 | $1,256,266 | 539,336 | 69,006 | $1,518,132 |
| Dec. 2020 SPO | $35 | 539,336 | 415,438 | 123,898 | $4,336,430 | 407,923 | 131,413 | $4,599,455 |
| Mar. 2021 SPO | $28 | 396,653 | 386,635 | 10,018 | $280,504 | 377,515 | 19,138 | $535,864 |

29.     Thus, assuming full exercise of the underwriters' option to purchase additional shares, Defendant Patel received $6,653,451 for selling his shares at the Offerings.

**Defendant Alstead**

30.     Defendant Troy Alstead ("Alstead") has served as a Company director since the IPO in October 2020.

31.     Defendant Alstead received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $118,016, which included $18,016 in fees earned or paid in cash and stock awards of $100,000.

**Defendant Ashford**

32.    Defendant Orlando D. Ashford ("Ashford") has served as a Company director since the IPO in October 2020.

33.    Defendant Ashford received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $118,016, which included $18,016 in fees earned or paid in cash and stock awards of $100,000.

**Defendant Cannova**

34.    Defendant Cannova has served as a Company director since the IPO in October 2020. Additionally, Defendant Cannova is a Vice President at Oaktree Capital Management, L.P., which is the investment manager of three defendants named herein: Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Defendant Cannova disclaims beneficial ownership of the shares of common stock that are beneficially owned by Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Current and former executives and employees of Oaktree Capital Management, L.P., such as Defendant Cannova, hold their interests in Array through Oaktree Capital Group Holdings, L.P.

35.    Defendant Cannova received compensation from the Company due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $14,837 in fees earned or paid in cash.

**<u>Defendant Corio</u>**

36.     Defendant Ron P. Corio ("Corio") is Array's founder. He has served as a Company director since, at least, the IPO in October 2020.

37.     Defendant Corio received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $13,777 in fees earned or paid in cash.

38.     Defendant Corio individually sold approximately 45.5 million of the Company's shares at inflated prices in the IPO, the December 2020 SPO, and the March 2021 SPO. The table below shows the proceeds Defendant Corio gained from the three Offerings:

| Offer | Offer Price | Shares Beneficially Owned Before Offering | Shares Beneficially Owned After Offering Assuming No Exercise of Underwriters' Option | Shares Sold Assuming No Exercise of Underwriters' Option | Proceeds Assuming No Exercise of Underwriters' Option | Shares Beneficially Owned After Offering Assuming Full Exercise of the Underwriters' Option | Shares Sold Assuming Full Exercise of the Underwriters' Option | Proceeds Assuming Full Exercise of the Underwriters' Option |
|---|---|---|---|---|---|---|---|---|
| IPO | $22 | 45,493,187 | 25,050,496 | 20,442,691 | $449,739,202 | 22,816,932 | 22,676,255 | $498,877,610 |
| Dec. 2020 SPO | $35 | 22,816,932 | 12,685,929 | 10,131,003 | $354,585,105 | 11,188,080 | 11,628,852 | $407,009,820 |
| Mar. 2021 SPO | $28 | 11,188,080 | 1,394,860 | 9,793,220 | $274,210,160 | 0 | 11,188,080 | $313,266,240 |

39.   Thus, assuming full exercise of the underwriters' option to purchase additional shares, Defendant Corio received $1,219,153,670 for selling his shares at the Offerings.

**Defendant Forth**

40.   Defendant Brad Forth ("Forth") has served as the Chairman of the Board since the IPO in October 2020.

41.   Defendant Forth received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received over $484,000, which included $37,622 in fees earned or paid in cash and $446,776 in stock awards.

42.   Defendant Forth individually sold approximately 45.5 million of the Company's shares at inflated prices in the IPO, the December 2020 SPO, and the March 2021 SPO. The table below shows the proceeds Defendant Corio gained from the three Offerings:

| Offer | Offering Price | Shares Beneficially Owned Before Offering | Shares Beneficially Owned After Offering Assuming No Exercise of Underwriters' Option | Shares Sold Assuming No Exercise of Underwriters' Option | Proceeds Assuming No Exercise of Underwriters' Option | Shares Beneficially Owned After Offering Assuming Full Exercise of the Underwriters' Option | Shares Sold Assuming Full Exercise of the Underwriters' Option | Proceeds Assuming Full Exercise of the Underwriters' Option |
|---|---|---|---|---|---|---|---|---|

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| IPO | $22 | 2,610,480 | 1,834,500 | 775,980 | $17,071,560 | 1,678,185 | 932,295 | $20,510,490 |
| Dec. 2020 SPO | $35 | 1,678,185 | 967,033 | 711,152 | $24,890,320 | 862,445 | 815,740 | $28,550,900 |
| Mar. 2021 SPO | $28 | 862,445 | 182,943 | 679,502 | $19,026,056 | 81,232 | 781,213 | $21,873,964 |

43. Thus, assuming full exercise of the underwriters' option to purchase additional shares, Defendant Forth received $70,935,354 for selling his shares at the Offerings.

**Defendant Jonna**

44. Defendant Peter Jonna ("Jonna") served as a Company director during the Relevant Period but left the Board effective May 10, 2021 and was replaced by non-party Jayanthi "Jay" Iyengar. Additionally, Defendant Jonna is a Managing Director at Oaktree Capital Management, L.P., which is the investment manager of three defendants named herein: Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Defendant Jonna disclaims beneficial ownership of the shares of common stock that are beneficially owned by Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Current and former executives and employees of Oaktree Capital Management, L.P., such as Defendant Jonna, hold their interests in Array through Oaktree Capital Group Holdings, L.P.

45. Defendant Jonna received compensation due to his membership on the Board of Directors for the year ended December 31, 2020. Specifically, he received $13,777 in fees earned or paid in cash.

**Defendant Lee**

46. Defendant Jason Lee ("Lee") has served as a Company director since the IPO in October 2020. Additionally, Defendant Lee is a Managing Director and Co-Portfolio Manager at

Oaktree Capital Management, L.P., which is the investment manager of three defendants named herein: Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Defendant Lee disclaims beneficial ownership of the shares of common stock that are beneficially owned by Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P. Current and former executives and employees of Oaktree Capital Management, L.P., such as Defendant Lee, hold their interests in Array through Oaktree Capital Group Holdings, L.P.

47.     Defendant Lee received compensation due to his membership on the Board for the year ended December 31, 2020. Specifically, he received $14,307 in fees earned or paid in cash.

**Defendant ATI Investment Parent, LLC**

48.     ATI Investment Parent, LLC held 100% of the common stock of ATI Intermediate Holdings, LLC at the time of the Company's October 2020 initial public offering. Together, defendants Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P., were at that time co-controlling members of ATI Investment Parent, LLC.

49.     ATI Investment Parent, LLC disposed of 47,625,000 shares in the IPO, 36,656,250 shares in the December 2020 SPO, and 35,475,457 shares in the March 2021 SPO.

**Defendant Oaktree ATI Investors, L.P.**

50.     Defendant Oaktree ATI Investors, L.P., together with Oaktree Power Opportunities Fund IV, L.P. and Oaktree Power Opportunities Fund IV (Parallel), L.P., was at all relevant times a co-controlling member of ATI Investment Parent, LLC. Oaktree ATI Investors, L.P. is managed by investment manager Oaktree Capital Management, L.P.

**Defendant Oaktree Power Opportunities Fund IV, L.P.**

51.     Defendant Oaktree Power Opportunities Fund IV, L.P., together with Oaktree ATI Investors, L.P. and Oaktree Power Opportunities Fund IV (Parallel), L.P., was at all relevant times a co-controlling member of ATI Investment Parent, LLC. Oaktree Power Opportunities Fund IV, L.P. is managed by investment manager Oaktree Capital Management., L.P.

**Defendant Oaktree Power Opportunities Fund IV (Parallel), L.P.**

52.     Defendant Oaktree Power Opportunities Fund IV (Parallel), L.P., together with Oaktree Power Opportunities Fund IV, L.P. and Oaktree ATI Investors, L.P., was at all relevant times a co-controlling member of ATI Investment Parent, LLC. Oaktree Power Opportunities Fund (Parallel), L.P. is managed by investment manager Oaktree Capital Management, L.P.

**Defendant Oaktree Capital Group Holdings, L.P.**

53.     Oaktree Capital Group Holdings, L.P. is the entity in which current and former executives and employees of Oaktree Capital Management, L.P. hold relevant ownership interests.

54.     According to a Schedule 13G form filed with the SEC on February 16, 2021, Oaktree Capital Group Holdings, L.P. owns approximately 38.2% of the business of Oaktree Capital Management, L.P., which is the investment manager of three of the defendants named herein: Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P.

**Defendant Oaktree Capital Management, L.P.**

55.     Oaktree Capital Management, L.P. is the investment manager of Oaktree Power Opportunities Fund IV, L.P., Oaktree Power Opportunities Fund IV (Parallel), L.P., and Oaktree ATI Investors, L.P.

56.     According to a Prospectus filed on March 22, 2021, Oaktree Capital Management, L.P. may be deemed to have beneficial ownership of the shares owned by ATI Investment Parent, LLC.

## DEFENDANTS' MISCONDUCT

### Background

57.     Array is a Delaware corporation based in Albuquerque, New Mexico that manufactures ground-mounting systems used in solar energy projects. The Company's principal product, commonly referred to as a single-axis "tracker," is an integrated system of steel supports, electric motors, gearboxes, and electronic controllers that moves solar panels throughout the day to maintain an optimal orientation to the sun.

58.     In October 2020, the Company became a publicly traded company via an IPO. Since then, the Company's shares have traded on the NASDAQ. The Company made two subsequent public offerings in December 2020 and March 2021. During the Relevant Period, the Company and its officers made numerous false and misleading statements, including statements made in connection to the three Offerings, resulting in an artificially inflated share price that benefitted the Defendants.

### False and Misleading Statements

#### The IPO Documents

59.     In September 2020, the Company filed a registration statement on Form S-1 in anticipation of an IPO. The Company subsequently made multiple amendments to the S-1, which was declared effective by the SEC on October 14, 2020 (the "Registration Statement"). The

Company also issued a Prospectus pursuant to Rule 424(b)(4) (together with the Registration Statement, the "IPO Documents").

60.    The IPO Documents stated that one of the Company's "Strengths" was the Company's "[d]emonstrated ability to reduce the cost of our products while increasing profit margins." This claim was bolstered by the following:

> In order to enhance the competitiveness of our products and increase our margins, *we continually work to reduce the cost of our products through innovation and rigorous supply chain management.* These efforts have resulted in a reduction in cost of goods sold per watt by approximately 23% from 2017 through 2019. This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, while simultaneously increasing gross profits and gross margins.

(Emphasis added.)

61.    The IPO Documents also claimed that the Company had "[r]igorous supply chain management supported by a sophisticated enterprise resource planning ("ERP") system":

> We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. *To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.*

(Emphasis added.)

62.    Additionally, the IPO Documents indicated that a key component of the Company's strategy was "[l]everaging our global supply chain and economies of scale to reduce product cost":

> Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large

volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

63.     However, the IPO Documents neglected to disclose that the Company was actually unable to reduce the cost of its products through rigorous supply chain management. In fact, even in 2020, before the IPO occurred, steel and freight prices had already begun rising substantially. The statements in the IPO Documents touting and attesting to the success of the Company's supply chain management and cost reduction capabilities were therefore materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading.

***November 2020 Investor Call***

64.     On November 6, 2020, the Company held a conference call with analysts to discuss the Company's financial results for Q3 2020. During that call, Defendant Patel stated:

Gross margins in the third quarter were lower than the prior year period as a result of having less revenue to absorb fixed costs as well as higher logistics costs, largely driven by the global shipping constraints due to COVID-19.

Importantly, we view both of these dynamics as short term in nature and not indicative of longer-term margin pressure. Operating expenses were roughly flat compared to prior period, excluding professional fees related to our IPO and change for contingent consideration, reflecting tight controls on expenses.

….

The chart for the contingent consideration relates primarily to an earn-out obligation we have with our founder in connection with his sale of the company to Oaktree in 2016. Adjusted EBITDA, which excludes the impact of the earn-out obligations, the IPO expenses and approximately $1 million of other nonrecurring and noncash costs, was $16.6 million for the third quarter, which exceeded our plan by a double-digit margin. Now turning to our 9-month results.

***Revenues for the nine months ended September 30, 2020, increased 64% to $692.1 million compared to $423.2 million for the prior year period, driven by increases in the volume of trackers delivered. Gross profits increased 86% to $167.3 million compared to $90.2 million in the prior year period, driven primarily by higher revenues.***

*Gross margins increased 24.2% from 21.3% in the prior year period, driven by reductions in purchase materials resulting from improved supplier arrangements and shifting volumes for certain components to new lower-cost suppliers and greater leverage of fixed costs against higher sales volumes.*

….

We decided to provide guidance for the full-year 2020 to give our new public investors additional insight into our outlook for the remainder of the year. Going forward, we will be providing annual guidance as part of our fourth quarter and full year earnings announcements. We will not be providing quarterly guidance in future periods.

For the full-year 2020 ending December 31, 2020, we expect revenues to be in the range of $845 million to $865 million, adjusted EBITDA to be in the range of $156 million to $160 million, adjusted net income per share to be in the range of $0.82 to $0.86. This assumes diluted shares outstanding for the three months ending December 31, 2020, of 126,123,723 shares and diluted shares outstanding for the 12 months ending December 31, 2020, of 121,535,154.

Our guidance excludes the impact of any onetime charges, expenses related to the recapitalization and IPO, income or expense related to contingent consideration as well as any related tax impacts.

(Emphasis added.)

65.     During the same call, Defendant Fusaro stated:

Solar with single-access trackers has proven to be one of the cleanest and lowest cost forms of generation, and we see demand for trackers growing faster than the overall market for solar as customers convert from fixed tilt. Moreover, customers are increasingly recognizing the superior reliability and durability of our tracking system, and that is leading to market share gains for our products. ***These factors, combined with our strong order book, give us confidence that we are very well positioned to have another year of substantial growth in 2021.***

(Emphasis added.)

66.     Defendant Fusaro's and Defendant Patel's statements touted positive metrics while downplaying the significance of rising shipping costs and also failing to reveal significant increases in steel prices. Therefore, the statements made in the November 2020 investor call were

materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading.

### December 2020 SPO Documents

67.    In anticipation of a secondary public offering ("SPO"), the Company filed an S-1 registration statement on November 30, 2020, which was later amended, as well as a prospectus pursuant to Rule 424(b)(4) on December 4, 2020 (collectively, the "December 2020 SPO Documents").

68.    The December 2020 SPO Documents repeated misleading or false statements contained in the IPO Documents.

69.    The December 2020 SPO Documents claimed that one of the Company's "Strengths" was its "[d]emonstrated ability to reduce the cost of our products while increasing profit margins." This claim was bolstered as follows:

> In order to enhance the competitiveness of our products and increase our margins, *we continually work to reduce the cost of our products through innovation and rigorous supply chain management.* These efforts have resulted in a reduction in cost of goods sold per watt by approximately 23% from 2017 through 2019. This has allowed us to reduce average selling prices by approximately 20% over the same period, driving significant increases in revenues, while simultaneously increasing gross profits and gross margins.

(Emphasis added.)

70.    The December 2020 SPO Documents further claimed that the Company had "[r]igorous supply chain management supported by a sophisticated ERP system":

> We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. *To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing*

> ***economies of scale. In addition, we believe the large volume of purchases that we make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.***

(Emphasis added.)

71.     Moreover, the December 2020 SPO Documents repeated statements in the IPO representing that a key component of the Company's strategy is "[l]everaging our global supply chain and economies of scale to reduce product cost":

> Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

72.     The December 2020 SPO Documents failed to disclose the Company's inability to reduce the cost of its products through rigorous supply chain management. In fact, the prices of steel and freight had already begun to rise substantially in 2020 before the December 2020 SPO occurred. Therefore, the statements in the December 2020 SPO Documents touting and attesting to the success of the Company's supply chain management and cost reduction capabilities were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading.

### The March 2021 Investor Call

73.     On March 9, 2021, the Company held a conference call with analysts to discuss the Company's financial results for Q4 2020. On that call, Defendant Fusaro stated:

> In the US market, we are continuing to grow our wallet share with existing customers as well as convert new customers to Array as demonstrated by our strong order book. During 2020, we added 38 new customers underscoring our ability to convert new accounts to Array products. Outside of the US, we are in the process of building the sales and supply chain and fulfillment infrastructure we need to service international customers. COVID-19 has slowed some of our plans that we expect to be able to accelerate our international strategy later this year as travel restrictions and other challenges created by the pandemic abate.

74.     On the same call, Defendant Patel implied that rising costs were not a concern because the Company had taken a "conservative approach" to its guidance:

> First, as [Fusaro] discussed earlier, we have made product innovation a priority and we are investing in it. In addition to the research center he discussed, we will be adding additional engineering resources and investing more in R&D. These investments have a near-term cost as we will be making the investments ahead of the incremental revenues that we expect to generate from new products. But the long-term results should be higher revenues, greater market share and increased margins. Second, we are investing in the sales, supply chain and fulfillment infrastructure we need to service our international customers. The more to our investments in new product development, we have a short-term mismatch between the cost of our investment and the revenues that they will yield. Third, our 2021 SG&A reflects additional public company costs, which will represent a year-over-year headwind for us. ***And finally, commodity prices and freight costs have increased significantly over the past several months as a result of the re-acceleration of the global economy while certain transportation and raw material capacity remains offline as a result of the pandemic. While we expect prices to normalize and our contracts allow us to pass on these costs to our customers, we have taken a conservative approach to our guidance by making these cost into the low end of our guidance assuming a delayed return to more normalized pricing.***
>
> I'd like to close by providing some key modeling assumptions for the full year 2021. As I mentioned earlier, the two-year push out of the ITC step down has impacted how customers time their orders. As a result, we will see a different quarterly distribution of revenues and earnings in 2021 than we did in 2020. We currently expect to generate 20% to 25% of our annual revenues in Q1, 25% to 30% in Q2, 25% to 30% in Q3, and 20% to 25% in Q4. We expect interest expense to be between $26 million to $28 million. Diluted weighted average share count for 2021 to be $127.5 million shares, and our effective tax rate to be 25%.

(Emphasis added.)

75.     During the March 9, 2021 conference call, at least five questions were posed by analysts seeking to uncover the impact of rising freight and steel costs on the Company's margins. One analyst asked:

> It wasn't clear to me as the impacts of these investments and other expenses during the year; how it's distributed across gross versus EBIT margins? So it sounded like it was more below the line, below operating expense related than it was direct costs. Can you just sort of give us some sense there?

76.    Defendant Patel responded:

So on the other – on the margin side, we built into our range. The impact of higher freight and raw material costs really not abating as quickly and that's really the other half of that cost that we have in our guidance range, Paul.

77.    Another analyst asked, "is the cost of steel becoming a problem for you, world steel [sic]?" Defendant Fusaro responded by characterizing steel as having no greater significance in comparison to any other commodities, despite steel being the Company's most key input. Defendant Fusaro further stated that ***"we obviously manage and monitor all commodities accordingly, and then we build in productivity measures to address that to continue to drive our value."*** (Emphasis added.) He continued on by dismissing concerns over rising costs on the basis that rising costs are routine and also by touting the Company's supply chain management:

*I mean, there is always going to be pressure on cost.* That's pretty much market-agnostic and product-agnostic. But that said, we've actually built up, we continue to build out our supply chain. We added 15 new suppliers in four new countries. So that's just going to be an area that we remain focused on going forward as we grow both domestic here and internationally.

(Emphasis added.)

78.    Another analyst posed the following: "a little bit back to the question around input costs and supply chain. Are you guys looking at any new materials that could potentially reduce your cost of goods sold?" In response, Defendant Fusaro indicated that he did not want to go into detail about the specific materials being considered by the Company: "Yes. Now, don't ask what they are."

79.    Another analyst asked:

So just a bit [sic], you're talking about the first half of the year fully booked based on the backlog and when would you be buying that steel just as it's been moving quite a bit? So have you locked in the steel as you locked in that pricing, so you have high visibility into the margins or not necessarily so?

80.     Defendant Patel responded:

Yes. So we typically – I'll just give you our typical order patterns. We typically
order material between six and 12 weeks from the date of the shipment. So we keep
very low inventory. So the impact obviously, if the COGS, the recent run up prices
would impact second half more than it would first half.

81.     Another analyst asked:

So in the guidance, you highlight your expectation that commodity prices and
freight charges to normalize over time. Just curious what drives that normalization
view and then how long it would take – how long the cost would need to remain
elevated before you seriously decided are considered passing it on to customers,
and *then how to think about any concerns surrounding implications to demand
from customers from higher costs?*

(Emphasis added.)

82.     Instead of addressing the analyst's concern about the implications of high costs on

customer demand, Defendant Patel responded by asserting that rising input costs could be dealt

with on a "case by case basis":

So as far as that first part of the question, as far as how long we think it is and
obviously, it's unknown, it's – we're on unprecedented times as far as the
commodity prices increasing. And it's really just – it's a lot of the – as the economy
begins to reopen, there is a lot of pre-pandemic capacity that still remains idle. So
we are thinking second half and late second half is when it's coming back online.
*And as far as your second half of the question, we're always evaluating all our
pricing on our projects and we know that we have that ability and we'll look at it
on a case by case basis, so.*

(Emphasis added.)

83.     The statements made in the March 2021 investor call were materially false and

misleading because, *inter alia*, they: (1) treated significant and abnormal increases in steel and

freight costs as everyday occurrences within the Company's control; (2) rejected calls to discuss

the Companies' strategies for dealing with rising costs, preventing full disclosure of the problem;

and (3) concealed the gravity of the increases in steel and freight prices by indicating that case-by-

case solutions would be sufficient. Additionally, Defendants Fusaro and Patel failed to disclose

23

material facts necessary to make their statements in the March 2021 investor call not false and misleading.

### The March 2021 SPO Documents

84.     In anticipation of a March 2021 SPO, the Company filed a registration statement on March 16, 2021 and a prospectus pursuant to Rule 424(b)(4) on March 22, 2021 (collectively, "March 2021 SPO Documents"). The March 2021 SPO Documents repeated false or misleading statements contained in the IPO Documents and the December 2020 SPO Documents.

85.     One of the Company's "Strengths" stated by the March 2021 SPO Documents was the Company's "[d]emonstrated ability to reduce the cost of our products while maintaining profit margins":

> In order to enhance the competitiveness of our products and increase our margins, *we continually work to reduce the cost of our products through innovation and rigorous supply chain management.* These efforts have resulted in a reduction in cost of goods sold per watt by approximately 22% from 2017 through 2020. This has allowed us to reduce average selling prices by approximately 22% over the same period, driving significant increases in revenues, while simultaneously increasing gross profit and maintaining gross margin.

(Emphasis added.)

86.     The March 2021 SPO Documents also repeated the claim that the Company had "[r]igorous supply chain management supported by a sophisticated enterprise resource planning ("ERP") system," stating the following:

> We have made substantial investments in our systems and supply chain designed to minimize material movement, working capital investment and costs of goods sold while enabling us to rapidly deliver large volumes of our products to project sites around the world. To minimize material movement and working capital investment, we typically ship purchased components representing more than 70% of our cost of goods sold directly from our suppliers to our customers' sites. *To lower our cost of goods sold, we employ components that are mass produced and widely available to maintain security of supply and to benefit from existing economies of scale. In addition, we believe the large volume of purchases that we*

*make afford us preferential pricing and terms from our suppliers, which creates a competitive advantage.*

(Emphasis added.)

87.    The March 2021 SPO Documents further stated that one key component of the Company's strategy is "Leveraging our global supply chain and economies of scale to reduce product cost":

> Purchased components are the largest contributor to our cost of goods sold. Our strategy is to continually reduce our cost of goods sold by leveraging the large volumes of materials and components we purchase against multiple, qualified suppliers to obtain the best price and terms while ensuring availability of inputs and mitigating the risk of supply chain disruptions.

88.    The March 2021 SPO Documents failed to disclose the Company's inability to reduce the cost of its products through rigorous supply chain management. In fact, steel and freight prices had already begun to rise substantially in 2020 and 2021 before the March 2021 SPO occurred. Therefore, the statements in the March 2021 SPO Documents touting and attesting to the success of Array's supply chain management and cost reduction capabilities were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading.

### The 2021 Proxy Statement

89.    On April 26, 2021, the Company filed the 2021 Proxy Statement with the SEC. Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to

90.    The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Alstead and Ashford to the Board for a three-year term; and (2) ratify the selection of BDO USA, LLP ("BDO") as the independent registered public accounting firm for the Company for the fiscal year ending December 31, 2021.

91.    The 2021 Proxy Statement stated the following regarding the risk oversight functions of the Board and each Board committee:

> The Board of Directors plays an important role in risk oversight at Array through direct decision-making authority with respect to significant matters, as well as through the oversight of management by the Board of Directors and its committees. In particular, the Board of Directors administers its risk oversight function through (1) the review and discussion of regular periodic reports by the Board of Directors and its committees on topics relating to the risks that Array faces, (2) the required approval by the Board of Directors (or a committee of the Board of Directors) of significant transactions and other decisions, (3) ***the direct oversight of specific areas of Array's business by the Audit, Compensation and Nominating and Corporate Governance Committees***, and (4) ***regular periodic reports from the auditors and other outside consultants regarding various areas of potential risk, including, among others, those relating to our internal control over financial reporting***. The Board of Directors also relies on management to bring significant matters impacting Array to the attention of the Board of Directors.

(Emphasis added.)

92.    The 2021 Proxy Statement also listed specified responsibilities of the Audit Committee, which at that time included Defendants Alstead, Ashford, and Lee. These responsibilities included, "reviewing and discussing with management and Array's independent registered public accounting firm, Array's system of internal controls, its critical accounting practices, and policies relating to risk assessment and management," through which ***"the Audit Committee discusses Array's major financial risk exposures and steps that management has taken to monitor and control such exposure."*** (Emphasis added.)

---

any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

93.     The 2021 Proxy Statement was materially misleading because it failed to disclose, *inter alia*, that contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Board committees' responsibilities, the Board and its committees, and in particular the Audit Committee, were inadequately exercising these functions as well as causing or permitting the Company to issue false and misleading statements. Therefore, the Defendants were breaching their fiduciary duties.

94.     The 2021 Proxy Statement also failed to disclose, *inter alia*, that: (1) steel prices had been increasing drastically since Q1 2020; (2) both ocean and truck freight costs had been increasing significantly since April 2020; (3) as a result, the Company's margins and prospects were rapidly declining; and (4) the Company failed to maintain adequate internal controls related to disclosures. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

95.     As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders ratified the selection of BDO as the Company's independent registered public accounting firm and also reelected Defendants Alstead and Ashford to the Board, allowing them to continue breaching their fiduciary duties to the Company.

**The Truth Emerges**

96.     On May 11, 2021, after the markets had closed, the Company reported its financial results for 2021 Q1. Due to increased steel and shipping costs, the Company reported lower revenues year-over-year as well as lower margins. In a press release and a Form 8-K filed with the SEC that day, the Company disclosed the following:

> "Revenues for the first quarter of 2021 were in line with our expectations and Adjusted EBITDA was slightly below our expectations as a result of higher than expected logistics costs. Results were lower compared to last year because of the unseasonably high volume of shipments we had in the first quarter of 2020 to

customers that were 'safe harboring' tracker systems in connection with the ITC step-down," said Jim Fusaro, Chief Executive Officer of Array Technologies.

….

"At the same time as we are seeing record demand for solar, our industry is contending with increases in steel and shipping costs that are unprecedented both in their magnitude and rate of change. ***From Q1 2020 to Q1 2021, spot prices of hot rolled coil steel, the primary raw material used in our products, more than doubled and have continued to increase in the second quarter with spot prices up over 10% since April 1st. Steel represents almost half of our cost of goods sold and we do not hold large amounts of steel inventory, so a significant increase in the price of steel over a short period of time can negatively impact our results.***

***"The continuing increases in both steel and freight costs will impact our margins in the second quarter and potentially in subsequent quarters if prices do not normalize.*** We are taking several actions to mitigate the impact on the balance of the year, including passing through higher commodity and shipping costs to our customers, fixing commodity prices with our suppliers, entering into long-term contracts with freight providers, further diversifying our supply base, and increasing order lead-times to give us more time to procure raw material.

….

**First Quarter 2021 Financial Results**

Revenues decreased 44% to $245.9 million compared to $437.7 million for the prior-year period, primarily driven by a reduction in the amount of ITC safe harbor related shipments.

Gross profit decreased 63% to $43.9 million compared to $118.4 million in the prior year period, driven primarily by lower volume in the quarter. ***Gross margin decreased from 27% to 18%, driven by less revenue to absorb fixed costs, higher margins on the 2020 safe harbor shipments, higher input costs due to a rapid increase in commodity prices and greater freight costs resulting in part from disruptions caused by the winter storm in Texas as well as port closures and congestion.***

Operating expenses increased to $30.8 million compared to $17.1 million during the same period in the prior year, primarily as a result of a $6.2 million increase in equity-based compensation due to the transition to being a public company, $2.4 million of one-time costs related to our common stock follow-on offerings, and higher costs associated with being a public company and an increase in headcount to support our product development and international growth initiatives.

Net income was $2.9 million compared to income of $73.7 million during the same period in the prior year, and basic and diluted income per share were $0.02 compared to basic and diluted earnings per share of $0.61 during the same period in the prior year.

Adjusted EBITDA decreased 69% to $34.5 million, compared to $110.7 million for the prior-year period.

Adjusted net income decreased 71% to $23.7 million compared to $82.3 million during the same period in the prior year, and adjusted basic and diluted adjusted net income per share was $0.19 compared to $0.69 during the same period in the prior year

(Emphasis added.)

97.    The Company also announced that Defendant Jonna, who at that time was a

Managing Director at Oaktree Capital Management, L.P., had resigned from the Board effective

May 10, 2021.

98.    Finally, on May 11, 2021, Defendant Fusaro revealed on an investor call that steel

prices had been rising since Q1 of 2020 and that freight costs had been rising since April 2020:

> ***[O]ur industry is contending with increases in steel and shipping costs that are unprecedented, both in their magnitude and rate of change. From the first quarter of 2020 to the first quarter of 2021, the spot price of hot rolled coil steel, the primary raw material used in our products, has more than doubled.*** Many industry analysts and market participants expected the dramatic increase in the price of steel to be temporary, which was reflected in futures markets that had indicated lower steel prices for the second half of the year throughout most of the first quarter. Based on those expectations, we felt confident in our ability to manage our input costs and maintain our margins. However, steel prices have continued to increase with spot prices of hot rolled coil up more than 10% since April 1st, and futures now indicate higher rather than lower steel prices for the remainder of the year.
>
> Steel represents almost half of our cost of goods sold, and we do not hold large amounts of steel and inventory. So, a significant increase in the price of steel over a short period of time can negatively impact our results.
>
> ***Coinciding with the increase in steel prices has been substantial increases in the cost of both, ocean and truck freight. The average cost to ship a container from Asia to the West Coast has increased by more than 145% from April 2020 to April 2021.*** There also remains a significant disruption across several U.S. ports, resulting from the April Suez Canal accident, and the February Texas storm, which has resulted in higher storage and expediting costs that we would not otherwise have had in a normal environment. ***The cost of truck freight has also increased significantly with the average cost per mile in the first quarter of 2021, up more than 30% versus last year, and costs have continued to increase in the second***

> *quarter.*
>
> ***The continued increases in both steel and freight costs will impact our margins in Q2, and potentially in subsequent quarters, if prices do not normalize.***

(Emphasis added.)

99.    During that same investor call, Defendant Patel summarized the financial results for Q1 2021, disclosing that the Company was unable to affirm previously issued financial guidance:

> Revenues for the first quarter decreased 44% to $245.9 million, compared to $437.7 million for the prior year period, primarily driven by a reduction in the amounts of ITC safe harbor related shipments that I discussed earlier.
>
> Gross profit decreased 63% to $43.9 million compared to $118.4 million in the prior year period, driven primarily by lower volume in the quarter. ***Gross margin decreased from 27% to 18%, driven by less revenue to absorb fixed costs, somewhat lower ASPs compared to the 2020 safe harbor shipments, higher input costs, due to primarily to higher steel prices and higher freight costs, resulting in part from disruptions caused by the winter storm in Texas, as well as West Coast port closures and congestion.***
>
> Operating expenses increased to $30.8 million compared to $17.1 million during the same period in the prior year, primarily as a result of a $6.2 million increase in equity-based compensation due to the transition to being a public company, $2.4 million of onetime costs related to our common stock follow-on offerings, higher costs associated with being a public company, and an increase in headcount to support our product development and international growth initiatives.
>
> Net income was $2.9 million compared to $73.7 million during the same period in the prior year, and basic and diluted income per share were $0.02 compared to basic and diluted earnings per share of $0.61 during the same period in the prior year.
>
> Adjusted EBITDA decreased 69% to $34.5 million compared to $110.7 million for the prior year period. Adjusted net income decreased 71% to $23.7 million compared to $82.3 million during the same period in the prior year. And adjusted basic and diluted adjusted net income per share was $0.19 compared to $0.69 during the same period in the prior year.
>
> ….
>
> ***Turning to our outlook. As [Fusaro] mentioned earlier, given the continuing increases we are seeing in steel and freight costs, as well as our ongoing review of open contracts to assess what costs we will pass on to our customers, we are not able to affirm our previously provided guidance for the full year. Looking ahead to the second quarter, we expect commodity price increases to delay some project starts, which will result in lower revenues and adjusted EBITDA versus the first quarter.***

(Emphasis added.)

100.     In response to an analyst's question as to why Company management decided not to hedge steel using financial hedges, Defendant Patel responded that "in the past, that has not been our strategy."

101.     On this news, which was released after markets had closed, analysts downgraded Array stock: Barclays cut Array from "Overweight" to "Underweight," Piper Sandler lowered its rating of Array to "Neutral" from "Overweight," and Roth Capital downgraded Array from "Buy" to "Neutral." Additionally, the Company's share price fell $11.49 (or approximately 46%) from $24.95 at close on May 11 to $13.46 at close on May 12.

## DAMAGES TO ARRAY

102.     As a direct and proximate result of the Defendants' misconduct, Array has lost and will continue to lose and expend many millions of dollars.

103.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, the Individual Defendants, and the controlling members of the Company's predecessor entity, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

104.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to Defendants who breached their fiduciary duties to the Company.

105.     As a direct and proximate result of the Defendants' conduct, Array has also suffered, and will continue to suffer, a loss of reputation and goodwill. Moreover, a so-called "liar's discount" will adversely affect the Company's stock in the future due to the Company's misrepresentations and the Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

106.    Plaintiff brings this action derivatively and for the benefit of Array to redress injuries suffered, and to be suffered, as a result of the Defendants' breaches of their fiduciary duties as directors, officers, and/or controlling shareholders of Array, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

107.    Array is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

108.    Plaintiff is, and has been at all relevant times, a shareholder of Array. Plaintiff will adequately and fairly represent the interests of Array in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

109.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

110.    A pre-suit demand on the Board of Array is futile and, as a result, excused. At the time of filing, the Board consists of the following eight individuals: Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, and Lee, (the "Director-Defendants"), and nonparty Jayanthi (Jay) Iyengar (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of eight Directors on the Board at the commencement of this action.

111.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. All of the foregoing renders the Directors

unable to impartially investigate the charges and unable to decide whether to pursue action against themselves as well as other perpetrators.

112.    In a total breach of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme was intended to make the Company appear more profitable, and therefore attractive, to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and therefore excused.

113.    Demand is also futile on Defendant Fusaro for the following, additional reasons. Defendant Fusaro has served as the Company's CEO since June 2018. As the Company admits, he is a non-independent director. The Company furnishes Defendant Foley with his principal occupation, for which he received over $3 million in compensation in both 2019 and 2020. As Defendant Fusaro sold as many as 978,798 shares in the IPO, the December 2020 SPO, and the March 2021 SPO, for a total return of as much as $28.6 million, it was completely contrary to his interest to ensure adequate disclosure of the Company's dimming prospects prior to the liquidation of his shares in the Offerings. As CEO, Defendant Fusaro was ultimately responsible for all of the false and misleading statements and omissions that were made in the IPO Documents, the December 2020 SPO Documents, and the March 2021 SPO Documents. Defendant Fusaro personally signed the S-1 registration statements associated with the three Offerings. As the Company's highest officer and as a director, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor adequate controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Fusaro is a defendant in

the Securities Class Action. For these reasons, Defendant Fusaro breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

114.    Demand is also futile on Defendant Alstead for the following, additional reasons. Defendant Alstead served as chairman of the Audit Committee at all relevant times. He personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. As a director and chairman of the Audit Committee, Defendant Alstead failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor adequate controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Alstead is a defendant in the Securities Class Action. For these reasons, Defendant Alstead breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

115.    Demand is also futile on Defendant Ashford for the following, additional reasons. Defendant Ashford served on both the Audit Committee and the Compensation Committee, serving as chairman of the Compensation Committee, at all relevant times. He personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. As a director, Defendant Ashford failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor adequate controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Ashford is a defendant in the Securities Class Action. For these reasons, Defendant Ashford breached his fiduciary duties, faces a

substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

116.    Demand is also futile on Defendant Cannova for the following, additional reasons. As a Vice President at Oaktree Capital Management, L.P., Defendant Cannova is responsible for overseeing investments in energy companies such as Array. Oaktree Capital Management, L.P. is the investment manager of the various Oaktree entities that control ATI Investment Parent, the parent company of Array's predecessor, ATI Intermediate Holdings, LLC. As a Vice President at Oaktree, he owes duties to Oaktree investors and managers to maximize the returns on investments undertaken by Oaktree. Therefore, Defendant Cannova's duty to ensure proper disclosure as a Director at Array was in direct conflict with his duty to maximize returns as a Vice President at Oaktree. As the Company admits, he is a non-independent director, and served for part of the Relevant Period as a member of the Audit Committee. Defendant Cannova personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. As a director, he failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor adequate controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Cannova is a defendant in the Securities Class Action. For these reasons, Defendant Cannova breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

117.    Demand is also futile on Defendant Corio for the following, additional reasons. Defendant Corio founded Array Technologies in 1989. He served as Chief Executive Officer and Chief Technical Officer of the Company from January 1989 to June 2018 and as Chief Innovation Officer of the Company from June 2018 to January 2019. He further served for a portion of the

Relevant Period as a member of the Nominating and Corporate Governance Committee. As the Company admits, he is a non-independent director. Defendant Corio sold as many as 45,493,187 shares in the IPO, the December 2020 SPO, and the March 2021 SPO, for a total return of as much as $1,219,153,670. As more than $1.2 billion dollars were at stake in the Offerings, it was complete contrary to Defendant Corio's interest to ensure adequate disclosure of the Company's dimming prospects prior to the liquidation of his shares in the Offerings. Defendant Corio personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. As a director with an extended history with the Company, Defendant Corio failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor adequate controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Corio is a defendant in the Securities Class Action. For these reasons, Defendant Corio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

118.    Demand is also futile on Defendant Forth for the following, additional reasons. Defendant Forth serves as Chairman of the Board of Directors and previously served as the Company's chief executive officer. As the Company admits, he is a non-independent director. Additionally, Defendant Forth is a Senior Advisor to Oaktree's GFI Energy Group. Prior to his position as senior advisor, he was a Managing Director at Oaktree from 2009 to 2016. His sales of as many as 2,529,248 shares during the Offerings grossed Defendant Forth as much as $70,935,354. As a Senior Advisor at Oaktree, he owes duties to Oaktree investors and managers to maximize the returns on investments undertaken by Oaktree. Accordingly, Defendant Forth's duty to ensure proper disclosure as a Director at Array was in direct conflict with his duty to

maximize returns as a Senior Advisor at Oaktree. It was therefore completely contrary to Defendant Forth's interest to ensure adequate disclosure of the Company's dimming prospects prior to the liquidation of his shares and the shares of Oaktree investors in the Offerings. Defendant Forth personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. During all of the Relevant Period, he served on both the Nominating and Corporate Governance Committee and the Compensation Committee. However, during his service on those committees and as the Chairman of the Board of Directors, Defendant Forth failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor adequate controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Forth is a defendant in the Securities Class Action. For these reasons, Defendant Forth breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

119.    Demand is also futile on Defendant Lee for the following, additional reasons. Defendant Lee has served as a Director at Array since June 2018, and also serves as a member of the Audit Committee. As the Company admits, he is a non-independent director. Defendant Lee has also worked at Oaktree since 2009. As a Managing Director and Co-portfolio Manager at Oaktree, he is responsible for the overall management of the group as well as its investing activities. Oaktree Capital Management, L.P. is the investment manager of the various Oaktree entities that control ATI Investment Parent, the parent company of Array's predecessor, ATI Intermediate Holdings, LLC. As a Vice President at Oaktree, Defendant Lee owes duties to Oaktree investors and managers to maximize the returns on investments undertaken by Oaktree. Therefore, Defendant Lee's duty to ensure proper disclosure as a Director at Array was in direct

conflict with his duty to maximize returns as a Managing Director and Co-portfolio Manager at Oaktree. Defendant Lee personally signed the S-1 registration statements associated with the December 2020 SPO and the March 2021 SPO. As a director, Defendant Lee failed to conduct adequate oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor adequate controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Lee is a defendant in the Securities Class Action. For these reasons, Defendant Lee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, thus, excused.

120.    Demand on the Board is futile for the following, additional reasons.

121.    The Director-Defendants' longstanding business and personal relationships with one another and with the Company prevent them from acting independently and in the best interests of the Company and the shareholders. For example, Defendants Forth, Cannova, and Lee are presently affiliated with Oaktree, which controls entities with substantial control over Array that sold tens of millions of shares in connection with the Offerings. Because Defendant Forth was compensated $0.2 million for consulting work in support of the transition that resulted in Defendant Fusaro becoming CEO, it is unlikely that either Defendants Forth or Fusaro would take action against each other. Likewise, because Defendant Fusaro sold hundreds of thousands of shares in the Offerings and Defendant Corio sold over one hundred million, it is exceedingly unlikely that either would decide to initiate investigatory or enforcement action against the other for the false and misleading statements and the failure to make adequate disclosures in connection with the Offerings, from which Defendants Fusaro and Corio both benefitted very lucratively. Accordingly, these conflicts of interest prevented the Director-Defendants from adequately

monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Demand upon the Director-Defendants therefore would be futile.

122.    Defendants Alstead and Ashford served as members of the Audit Committee throughout the Relevant Period, with Defendant Lee replacing Defendant Cannova as the third member of the Audit Committee during the Relevant Period (together, the "Audit Committee Defendants"). Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, *inter alia*, the establishment of satisfactory disclosure controls and internal control over financial reporting, as well as the Company's compliance with laws and regulations. The Audit Committee Defendants failed to ensure adequate disclosure controls and also failed to ensure compliance with laws and regulations, as they are charged to do under the Audit Committee Charter. The Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is therefore excused as to them.

123.    As set forth in the Corporate Governance Guidelines, it is the Board's responsibility "[t]o ensure that Company management maintains an effective system for timely reporting to the Board or appropriate Board committees and to the public … significant accounting, regulatory, competitive, litigation **and other external issues affecting the Company**." (Emphasis added.) The Corporate Governance Guidelines further state that it is the responsibility of the members of the Board "[t]o disclose promptly to the Board any existing or proposed relationships with the Company (other than service as a Board member or on Board committees) which could be required to be disclosed or could affect the independence of the director under applicable listing standards." However, the Board failed to ensure that management maintained an effective system for reporting significant external issues, such as rising steel and freight costs, affecting the Company. The

Director-Defendants breached their fiduciary duties, are not disinterested, and demand is therefore excused as to them.

124.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

125.    Array has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors, including non-party Director Iyengal, have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Array any part of the damages Array suffered and will continue to suffer thereby. Therefore, any demand upon the Directors would be futile.

126.    The Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Therefore, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As nearly all of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of

exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

127.    The acts complained of herein constitute violations of fiduciary duties owed by Array's officers and directors, and these acts are incapable of ratification.

128.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Array. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of Array, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. As a result of the foregoing, demand on the Directors is futile, and thus, excused.

129.    If there is no directors' and officers' liability insurance, then the Directors will not cause Array to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

130.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee for violations of Section 14(a) of the Exchange Act**

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

133.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

134.    The 2021 Proxy Statement was materially misleading because it failed to disclose, *inter alia*, that contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Board committees' responsibilities, the Board and its committees, and in particular the Audit Committee, were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements, and thus Director-Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee were breaching their fiduciary duties.

135.    Under the direction and watch of Director-Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee, the 2021 Proxy Statement also failed to disclose, *inter alia*: (1) steel prices had been rising significantly since Q1 of 2020; (2) both ocean and truck freight costs had starkly increased since April 2020; (3) the Company failed to maintain adequate internal controls related to disclosures; and (4) the Company's margins and prospects were rapidly declining. As a result, the 2021 Proxy Statement was materially false and misleading.

136.    In the exercise of reasonable care, Defendants Fusaro, Alstead, Ashford, Cannova, Corio, Forth, Jonna, and Lee should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of Defendants Alstead and Ashford and the ratification of the selection of BDO USA, LLP as the independent registered public accounting firm for the Company for the fiscal year ended December 31, 2021.

137.    The false and misleading elements of the 2021 Proxy Statement led to, *inter alia*, the election of the Defendants Alstead and Ashford, which allowed them to continue to breach their fiduciary duties to Array.

138.    The Company was damaged as a result of the Defendants Fusaro's, Alstead's, Ashford's, Cannova's, Corio's, Forth's, Jonna's, and Lee's material misrepresentations and omissions in the 2021 Proxy Statement.

139.    Plaintiff, on behalf of Array, has no adequate remedy at law.

## SECOND CLAIM

### Against the Defendants for Breach of Fiduciary Duties

140.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

141.    Each Defendant, including the Oaktree Defendants, as co-controlling shareholders, owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Array's business and affairs.

142.    Each of the Individual Defendants and controlling shareholders violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

143.    The Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Array.

144.    In breach of their fiduciary duties owed to Array, the Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) steel prices had been increasing drastically since Q1 2020; (2) both ocean and truck freight costs had been increasing significantly since April 2020; (3) as a result, the Company's margins and prospects were rapidly declining; and (4) the Company failed to maintain adequate internal controls related to disclosures. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

145.    The Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact. In further breach of their fiduciary duties, the Defendants failed to and/or caused the Company to fail to maintain disclosure controls.

146.    The Oaktree Defendants and at least four of the Individual Defendants—Corio, Forth, Fusaro, and Patel—breached their fiduciary duties by selling shares at artificially inflated prices in the Offerings, which were artificially inflated due to Defendants' misconduct in making and/or causing the Company to make materially false and misleading statements about the Company's costs, margins, and prospects.

147.    The Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Array's securities.

148.    The Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for

the purpose and effect of artificially inflating the price of Array's securities. The Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

149.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

150.    As a direct and proximate result of the Defendants' breaches of their fiduciary obligations, Array has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

151.    Plaintiff on behalf of Array has no adequate remedy at law.

## THIRD CLAIM

**Against the Oaktree Defendants for Aiding and Abetting Breaches of Fiduciary Duty and the Individual Defendants' Other Violations of Law**

152.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

153.    The Oaktree Defendants, in addition to having fiduciary duties to the Company by virtue of being co-controlling shareholders in the Company, aided and abetted the Individual Defendants who breached their fiduciary duties to the Company, abused their control, grossly mismanaged the Company, wasted corporate assets, violated the Exchange Act, and were unjustly enriched thereby.

154.    The Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

155.    Specifically, the Oaktree Defendants aided and abetted the Individual Defendants in making false and misleading statements about the Company's internal controls and the adequacy of the Company's financial statements, allowing the artificial inflation of the price of Company

stock for the purpose of enriching insiders, including investors affiliated with the Oaktree Defendants.

156.    The Oaktree Defendants are jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws, including for any unjust enrichment the Oaktree Defendants received from Array while it violated the Exchange Act and aided and abetted the Individual Defendants' aforementioned violations of law.

157.    As a direct and proximate result of the Oaktree Defendants' aiding and abetting of Array's directors' and officers' breaches of duty and other misconduct alleged herein,  Array has sustained and will continue to sustain substantial damages.

158.    Plaintiffs on behalf of Array have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Array, and that Plaintiff is an adequate representative of Array;

(b)    Declaring that the Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Array;

(c)    Determining and awarding to Array the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Array and the Defendants to take all necessary actions to reform and improve Array's corporate governance and internal procedures to comply with applicable laws

and to protect Array and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Array to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding Array restitution from the Defendants;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  July 30, 2021     Respectfully submitted,

           **THE ROSEN LAW FIRM, P.A.**

           */s/ Phillip Kim*
           Phillip Kim
           275 Madison Avenue, 40th Floor
           New York, NY 10016
           Telephone: (212) 686-1060
           Facsimile: (212) 202-3827
           Email: pkim@rosenlegal.com

           *Counsel for Plaintiff*

## **VERIFICATION**

I,    Kyu Ho Han    a    plaintiff in    the    within    action. I have  reviewed    the    allegations    made    in    this    verified  consolidated shareholder  derivative    complaint,    know the  contents  thereof,    and  authorize    its    filing. To    those allegations    of    which    I    have personal knowledge, I  believe  those allegations to  be  true. As  to  those  allegations  of  which I  do  not have  personal knowledge, I rely upon my  counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of 7/27/2021_____, 2021.

Kyu Ho Han